DEK ENERGY COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Pan–Alberta Gas, Ltd.,
et al., Intervenors.

No. 00–1020.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 20, 2001.

Decided May 4, 2001.

MaryJane Reynolds argued the cause and filed the briefs for petitioner.

Beth G. Pacella, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was Dennis Lane, Solicitor. Susan J. Court, Special Counsel, entered an appearance.

John R. Staffier argued the cause for intervenors Pan–Alberta Gas, Ltd., et al. With him on the brief were Marisa A. Sifontes, Mary Ann Walker and Lee A. Alexander. Neil L. Levy, Carl M. Fink and Stefan M. Krantz entered appearances.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge Stephen F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

This dispute arises out of a proposal to restructure a contractual relationship providing for the transportation and sale of gas from Pan–Alberta Natural Gas Ltd. in Canada ("Pan–Alberta") to Southern California Gas Company ("SoCal"). Petitioner DEK Energy Company, which sells gas in Northern California, objects to one element of the transaction. Under the restructuring, an entitlement to ship 244,000 million Btu ("MMBtu") per day of gas from the Canadian border to Stanfield, Oregon was transferred from Pacific Interstate Transmission Company to Pan–Alberta's affiliate, Pan–Alberta Gas (U.S.), Inc. ("Pan–Alberta–US"). DEK objects that, pursuant to the Federal Energy Regulatory Commission's approval, Pan–Alberta–US will enjoy a lower rate for this service than DEK believes would prevail if FERC had not made various legal errors. DEK claims that it will suffer a competitive injury if the gas in question ends up being sold in Northern California. Because DEK has not shown that any competitive injury is more than highly speculative, we dismiss the petition for want of Article III standing.

\* \* \*

Under a now superseded agreement, Pan–Alberta sold 244,000 MMBtu per day of Canadian gas to Northwest Alaskan Pipeline Company. Northwest Alaskan then sold it to the Pacific Interstate Transmission Company, a wholly owned SoCal subsidiary that had been created as a middleman to overcome regulatory restrictions on gas purchases at an international border by local distribution companies such as SoCal. Pacific Interstate Transmission used facilities of Pacific Gas & Electric Company Gas Transmission, Northwest Corporation ("PG&E GT–NW") to deliver the gas to Stanfield, Oregon. Thereafter the gas traveled on other pipelines through Ignacio, Colorado to the Arizona/California border and SoCal's California transmission system. To fulfill its delivery obligations for the leg of the journey from the Canadian border to Stanfield, Oregon, Pacific Interstate Transmission held 244,000 MMBtu per day capacity on the PG&E GT–NW pipeline.

In 1998 the parties to the agreement filed petitions under § 7(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717f(b), and § 9 of the Alaska Natural Gas Transportation Act, 15 U.S.C. § 719, seeking approval from the Commission for a restructured arrangement removing Northwest Alaskan and Pacific Interstate Transmission from the process and allowing SoCal to purchase Canadian gas directly from Pan–Alberta–US. The new agreement provided that Pacific Interstate Transmission

would assign its full entitlement to 244,000 MMBtu/day of PG&E GT–NW's capacity to Pan–Alberta–US, which would pay the same rate as Pacific Interstate Transmission had. At the same time, the sales obligation to SoCal picked up by Pan–Alberta–US was reduced to 144,000 MMBtu/day, thereby leaving 100,000 MMBtu/day in excess capacity. As consideration for Pan–Alberta–US's assumption of these obligations (and the attendant risks), Pacific Interstate Transmission proposed to pay Pan–Alberta–US $31 million.

Petitioner DEK sells gas in the Northern California market. It holds about 11,-000 MMBtu/day capacity on PG&E GT–NW from the Canada/Idaho border all the way to the Oregon/California border under a firm 20–year contract expiring in 2013. Its theory of competitive injury stems largely from the rate structure on PG&E GT–NW, under which shippers pay (at least) three different rates, evidently depending on the time at which they started taking service (the lower rates being associated with the earlier dates). Pan–Alberta–US enjoys the middle rate, the same as formerly paid by Pacific Interstate Transmission, whereas DEK pays the highest rate. (By October 2002, evidently, virtually all shippers will pay the same rates.) DEK claims that if Pacific Interstate Transmission's capacity had been disposed of in what it regards as the legally required manner, under the "capacity release" program, the successor shipper would, like DEK, have been subjected to the highest rate. Although the Commission and intervenors (Pan–Alberta and Pan–Alberta–US) contest this claim, we assume it to be correct.

In the proceedings before the Commission, DEK pressed its contention that the capacity could be transferred only through the capacity release mechanism; FERC rejected the claim on the merits, offering several reasons, including its view that Pan–Alberta–US was not truly a new or replacement shipper intended to be covered by the generic capacity release rate policy. It therefore approved the proposed restructuring. See *Pacific Interstate Transmission Co.*, 85 FERC ¶ 61,378, 1998 WL 878023 (1998). DEK reiterated its objections in a request for rehearing, and was rebuffed again. See *Pacific Interstate Transmission Co.*, 89 FERC ¶ 61,246, 1999 WL 1073896 (1999). Before us, FERC not only defends its decision on the merits but presses two jurisdictional defenses. First it argues that DEK has failed to establish injury-in-fact as required under Article III of the U.S. Constitution (and § 19(b) as well). And it argues that DEK's challenge is a collateral attack on a 1996 rate settlement order, and thus precluded by the 60–day time limit imposed on petitions for review of FERC decisions. See NGA § 19(b), 15 U.S.C. § 717r(b). Because of our decision on Article III standing, we need not reach the other jurisdictional defense and we cannot reach the merits.

■ Article III requires that a petitioner seeking access to federal courts must allege an "an injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation omitted). Here DEK claims only that Pan–Alberta–US's enjoyment of a lower tariff may injure DEK by enabling Pan–Alberta–US to sell the 100,000 MMBtu per day in the Northern California market under conditions that might either completely undercut DEK's sales, or force it to reduce its prices. There is no claim that Pan–Alberta–US has yet exploited the PG&E GT–NW capacity to sell a single molecule of gas in Northern California. As *any* substantial new delivery of gas into DEK's

market area would presumably tend to lower the market-clearing price, we take it that Pan–Alberta–US's especially favorable rate is relevant largely because it would enhance Pan–Alberta–US's *ability* to sell profitably in DEK's areas and thus would increase the *probability* of such entry, and, moreover, to sell at rates and in quantities that might force DEK to cut its prices or lose sales.

 There is quite a gulf between the antipodes of standing doctrine—the "imminent" injury that suffices and the merely "conjectural" one that does not. We have insisted that to escape the latter characterization the claimant must show a substantial (if unquantifiable) probability of injury. In a recent case involving extension of natural gas pipelines we said, "The nub of the 'competitive standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will *almost surely* cause petitioner to lose business, there is no need to wait for injury from specific transactions." *El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 27 (D.C.Cir.1995) (emphasis supplied). In that case petitioner El Paso, a potential competitor in the Baja California market, claimed to be injured by FERC's decision that certain local distribution companies attempting to extend their pipelines into that part of Mexico would not be subject to FERC regulations but instead to those of the California Public Utilities Commission. We found no standing, as El Paso had failed to show that it was really going to compete in Baja California, not having satisfied certain pre-conditions to FERC approval of its entry into that market. See *id.*

 In the present case DEK's claimed injury is similarly too speculative. The basic proposition is that FERC's alleged error increased the likelihood that DEK will be exposed to additional competition in its Northern California markets—

competition weighty enough either to reduce DEK's sales or force it to cut its prices. To consider the degree of likelihood, we need to focus on the alternative outcomes of the proceeding. There seem to be three relevant possibilities: (1) FERC, accepting DEK's view of the law, might have insisted on applying the regular capacity release procedures, demanding that the rate on the transferred entitlement to ship to Stanfield be the higher one, and this insistence would have torpedoed the entire restructuring. (This is FERC's view of what would have happened.) (2) FERC, accepting DEK's view of the law, might have insisted on the capacity release provisions, but the restructuring would have survived, and Pan–Alberta–US would have paid the highest rate for its use of the Canada-to-Stanfield capacity. (This is DEK's view of what would have happened.) (3) FERC might have acted as it did, allowing Pan–Alberta–US to use the Canada-to-Stanfield capacity at the previously prevailing rate. There is a fourth alternative: FERC might have insisted on the increased rate and the restructuring would have gone through, but at the higher rate the capacity might have attracted no takers and the daily 100,000 MMBtu would not have flowed south from Canada at all. For DEK this fourth possibility might have been the most appealing, as it would likely preclude the gas from ever reaching (and thereby affecting) the Northern California market, but neither DEK nor any party asserts it as a possibility and we therefore discard it. Accordingly, the key issue is the likely difference in impact on DEK as between FERC's actual choice (alternative (3)) and the other two.

Alternative (1) leaves the capacity in Pacific Interstate Transmission's hands under the terms of the original agreement. Superficially that might appear to favor DEK, with the capacity committed to the SoCal transaction. But the restructured

deal sought to reduce SoCal's purchase obligation by the very 100,000 MMBtu/day in question, suggesting that that quantity was surplus to SoCal. Thus, even assuming that under this scenario the gas proceeds on to Southern California, we have no clue whether DEK's interest in the Northern California market is any more jeopardized by gas that has reached Stanfield, Oregon (as under FERC's actual order) than by gas held by SoCal in Southern California and viewed by it as surplus. DEK has given no detail on the location of its Northern California markets, or on the options for moving gas to those markets from Stanfield or from Southern California. We note, purely by way of example, that the distance from Stanfield to San Francisco appears to be nearly 600 miles as the crow flies and over 800 miles by road.

Under alternative (2) the restructuring goes forward and the Canada-to-Stanfield rate is higher for Pan–Alberta–US than under FERC's order. But it is unclear whether FERC's order makes it more likely that DEK will be subject to material competition from Pan–Alberta–US. Everything else being equal, DEK would prefer to see potential rivals' costs high than low. But the gas reaches *Stanfield* either way, and Pan–Alberta–US's decisions whether to sell it in DEK's Northern California markets or elsewhere will depend on both gas market conditions there and in alternative markets reachable from Stanfield, and on transportation costs from Stanfield to the alternative markets. DEK presents no evidence on these matters, even though it is entitled on appeal to supplement the agency record in order to demonstrate standing. See *Western Pow-* *er Trading Forum v. FERC,* 245 F.3d 798, 801–03 (D.C.Cir.2001); *Northwest Environmental Defense Center v. Bonneville Power Administration,* 117 F.3d 1520, 1527 (9th Cir.1997).

At oral argument, counsel for intervenor Pan–Alberta–US noted that Pan–Alberta–US's current practice is to sell its capacity on a spot market without any regard to the transported gas's final destination, deferring any long term commitment of the excess capacity. Some of this gas may well wend its way into DEK's markets. But without more information from which to infer quantities capable of having a market effect, that is an inadequate basis for saying that that FERC's decision "will almost surely" cause DEK "to lose business," *El Paso,* 50 F.3d at 27, or to cut prices in order to preserve business.

We recognize that whenever a gas vendor secures transport capacity that enables it to ship gas closer to another vendor at competitive rates, the latter may perceive an increased risk of competition. But under any of the scenarios relevant here, the 100,000 daily MMBtu of gas will arrive at a point several hundreds of miles from DEK's market, with some vague probability that any gas will actually reach that market and a still lower probability that its arrival will cause DEK to lose business or drop its prices. More is needed to move an injury from "conjectural" to "imminent."

The petition is

*Dismissed.*